UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MARY JANE SMOOT,  )<br>  )<br>Plaintiff,  )<br>  )<br>v.  )<br>  )<br>CITY OF SHAVANO PARK, TEXAS  )<br>Defendant.  )<br>  ) | Civil Case No. 19-cv-865<br><br>DECLARATORY AND INJUNCTIVE<br>RELIEF SOUGHT |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff MARY JANE "MJ" SMOOT complains as follows:

### Preliminary Statement

1.      This is a civil action for declaratory and injunctive relief arising under the First and Fourteenth Amendments to the Constitution of the United States. This suit concerns the constitutionality of the City of Shavano Park's sign code ("Sign Code"), set forth in chapter 24 of the City's Code of Ordinances.

### Jurisdiction and Venue

2.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. This civil action arises under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.  In addition to other relief, Plaintiff seeks a declaration of her rights in this case of actual controversy within this court's jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant City of Shavano Park is located in this district, and the Defendant's official duties are performed in this district.  Additionally, a substantial part of the events giving rise to this claim occurred in this district.

## Parties

4.      Plaintiff Mary Jane "MJ" Smoot is an individual who resides in Shavano Park, at 101 Shavano Drive.

5.      Defendant City of Shavano Park, Texas (City) is a Type A general law municipality in Bexar County, Texas with the capacity to sue and be sued.  Its main address is 900 Saddletree Court, Shavano Park, Texas 78231.  The City is a subdivision of the State of Texas.  The City and its officials are responsible for creating, adopting, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs for the City.

## Statement of Facts

### Enforcement of the Sign Code Against Plaintiff MJ Smoot's Campaign Signs

6.      Shavano Park holds elections for municipal office every year.  In odd-numbered years, on the first Saturday of May, voters select a Mayor and two Aldermen at large. SHAVANO PARK, TEX. CODE § 12-3.  In even-numbered years, on the first Saturday of May, voters select three Aldermen at large.  *Id.*  The office of Mayor is voted upon separately, but all candidates for Aldermen run against one another, and the candidates receiving the most votes are elected to the positions available (two or three positions, as applicable).  *Id.* § 12-4.

7.      According to the Code of Ordinances, there is a single election precinct for Shavano Park, with the City Municipal offices at 900 Saddletree Court designated as the official polling place for the precinct.  *Id.* § 12-2.

8.     Plaintiff Smoot has run for Shavano Park Alderman three times, in 2015, 2016, and 2017.

9.     Smoot generally campaigns on a platform of increased transparency and fiscal responsibility.  She considers herself a conservative Republican in favor of limited government and less regulation.  She believes that the incumbent administration of the City, in particular Mayor Bob Werner, Michael Colemere, and Michelle Ross, have exhibited an unfortunate penchant for overreaching and unnecessary regulation and spending, which motivated her to run for office.

10.     Smoot's political views and platform have pitted her against this majority of the Shavano Park City Council, including Mayor Werner and Michelle Ross, who have both served since her first campaign and who remain in office.

11.     When Smoot first ran in 2015, she distributed campaign yard signs that were placed in the residential yards of her supporters, with the homeowners' permission.  Some of those signs were the larger, but still standard, size of 4' x 8'.

12.     City Manager Bill Hill delivered the message to Smoot that her 4' x 8' signs violated the city Sign Code, per Mayor Werner.

13.     Smoot's signs in the Shavano Creek subdivision were removed in the 2015 campaign.  On information and belief, those signs were removed by city officials.

14.     At the same time, Smoot's yard signs that were displayed on the old side of Shavano Park were not removed.

15.     Smoot resides on the old side of the city, and she believes that city officials allowed the signs on that side to remain, because if those had been removed, she would have noticed immediately.

16.     Smoot's campaign in 2015 was not successful.

17.     In October 2016, the City of Shavano Park enacted the present Sign Code, discussed further below.

18.     Smoot ran again in 2017.   As part of her 2017 campaign, Smoot once again distributed campaign yard signs, including some that were 4' x 8'.   She also paid for the preparation of a number of vinyl banner signs which were approximately 3' x 5'.   Those vinyl signs read: "Vote for MJ and Walk Away."

19.     Smoot specifically informed City Manager Bill Hill that she had homeowner permission for all displayed signs, including the 4' x 8' signs.

20.     However, on Thursday, April 27, 2017, several weeks after Smoot had already informed Hill that the signs were displayed with homeowner permission, Hill notified her by text message that she must remove her 4' x 8' signs from City Hall property, and must remove all 4' x 8' signs on private property in the City, to comply with the Sign Code.

21.     Smoot later learned through a friend, Patrick Von Dohlen (another candidate, who was running for City of San Antonio office), that city officials had removed all 4 x 8 signs from City Hall property.   Von Dohlen said he had found Smoot's 4 x 8 sign that had been at City Hall lying next to the trash bin, and he returned it to her.   Von Dohlen found his own sign cut apart and actually inside the trash bin.

22.     The following day was Fiesta Friday, a day on which many local business and government offices are closed in the San Antonio area, including Shavano Park.

23.     On Fiesta Friday, Bill Hill sent another text message to Smoot, at 11:35 am, stating that the 4' x 8' signs *and vinyl banner signs* must be removed from City Hall *and from residential properties* that same day.   This was during early voting.

24.     The banner signs Hill was referring to were approximately 3' x 5', made of vinyl that could be rolled up and therefore more easily portable.

25.     In order to avoid having her signs destroyed or removed and held by the City in the midst of a campaign and during the early voting period, in response to Hill's instructions, Smoot removed ten of her campaign signs from different locations around the City that day, including some from residential property.

26.     Smoot's campaign signs were thus down and not communicating her campaign messages for four voting days, two of which were 12-hour days.  Smoot suffered actual damages as a result, as she paid for expensive campaign signs that she was forced to remove pursuant to an unconstitutional ordinance.

27.     Smoot lost that 2017 race by 25 votes.

**Smoot did not Run for Election in 2019 or Display Signs Due to the Unconstitutional Sign Code**

28.     In May 2019, the Mayor's office and two Alderman seats were up for election in Shavano Park.  All three of the individuals whose offices were on the ballot, that is, Mayor Bob Werner, Alderman Michael Colmere, and Alderman Michelle Ross, are strongly opposed by Smoot, and they are all strongly opposed to her.

29.     Smoot was interested in running for Shavano Park office in 2019, but believed that the restrictions imposed by the Sign Code meant that she would be unable to communicate her message effectively and in the manner she desired.  As a result, she did not run for alderman.

30.     Had the City's Sign Code not been in place, Smoot would have run for office.

31.     Consequently, all three seats were unopposed.  Werner, Colmere, and Ross were reelected without opposition on the ballot.

32.     Because all seats were unopposed, neither the candidates nor Smoot placed any signage specifically supporting any candidates running for office.

33.     Smoot intends to run for City office again, and potentially in 2020.

**Smoot's Desire to Display Additional Election, Political, and Event-Driven Signs**

34.     Smoot desires to engage more Shavano Park residents in municipal issues and elections, to stand up for good government and fiscal responsibility, and to fight back against the incumbent administration's consistent, petty, and politically-motivated overreaching.

35.     Smoot also desires to place additional signage supporting candidates for state-wide and federal office, and communicating messages regarding causes and community events, but the Sign Code strictly prohibits the display of her desired speech.

36.     As explained further below, the Sign Code prohibits *all* signs "on private property located in the City," "[e]xcept as otherwise provided for in chapter [24]."  Code § 24-3.

37.     Generally, chapter 24 only allows "one sign" on each residential property so long as it follows onerous restrictions, including that is not visible from the public right of way more than sixty days per year, not illuminated, not in the public right-of-way, not raised above six feet, nor larger than six square feet.  Code § 24-6(2).

38.     While the Sign Code generally allows only "one sign" displayed for no more than sixty days per year, special exceptions are granted for particular signs. That is, different restrictions apply to signs in recognition of student "activities" or "achievements," signs denoting a property is being sold, "banner signs" (a term undefined in the Code) during the "seven days prior to the first Tuesday in October," and signs centered around voting periods. Each of these excepted categories comes with its own set of qualifications.

39.     The "voting period" exception "corresponds only with elections administered by Bexar County." Code 24-2. With respect to such elections, in addition to the "one sign" allowed under 24-6(2) and student achievement signs, each residential property is allowed to display additional signs beginning 60 days prior to the start of the "voting period." Such signs must be removed before midnight on the day after the last voter has voted. These signs may not be raised above six feet, and must individually be no larger than twenty-four square feet or thirty-six square feet in total. Code § 24-6(5).

40.     State law sets out a strict time period during which anyone interested in running for Shavano Park office must submit an application for a place on the ballot. With respect to the May 2020 uniform election date, applications for a place on the ballot must be filed between January 15, 2020 and February 14, 2020. *See* Tex. Elec. Code § 143.007(a), (c).[1]

41.     Smoot desires to display signs in her yard (and encourage friends and neighbors to display signs) with a message geared toward encouraging greater attention to Shavano Park municipal government and encouraging other residents to run for Shavano Park office in the May 2020 elections. These signs would read: "Run for Office! Shavano Park candidate filing deadline Feb. 14, 2020."

42.     Smoot believes it is important to display such signs early in the political cycle, so that the message can be conveyed in time to reach residents while they still have time to consider filing as candidates, with all the personal and family decisions that such a decision entails.

43.     However, these signs would not be permitted as "voting period" signs because they would be displayed well before the "voting period" as defined by Shavano Park.

---

[1] *See* Texas Secretary of State, May 2020 Election Law Calendar, https://www.sos.state.tx.us/elections/voter/2020-important-election-dates.shtml

44.     Smoot also desires to display a sign before and after "voting period[s]" reading: "PLEASE STOP FEEDING THE RINOS. Sincerely, Conservatives Everywhere."  The sign is a standard 2' x 3' campaign yard sign, which includes an image of a rhinoceros.

45.     Smoot also desires to immediately display a sign or signs with messages regarding the Texas Department of Transportation's Northwest Military Highway project.  The project is controversial in Shavano Park.  The Highway runs right through Shavano Park.  As currently devised, the project calls for the removal of all oak trees "pole to pole," that is, from telephone pole to telephone pole, surrounding the highway.  Smoot and many other Shavano Park residents are strongly opposed to removing all of the oak trees as part of this project.

46.     State authorities have held several community meetings with San Antonio and Shavano Park residents, but Smoot believes that signs could be an effective way of communicating the message to state authorities and generating additional awareness and concern in the community.

47.     The project is currently slated to begin construction in spring 2020, and Smoot believes there is still time to affect the plan for the oak trees.

48.     Therefore, she desires to immediately display a sign or signs with appropriate messages, such as "Save our Oak Trees!"  Smoot also desires to include on these signs in particular messages inviting concerned viewers to meetings to organize opposition to the project as currently slated.

49.     Smoot wants to display in the yard at her home one of the "Stop Feeding the RINOs" signs.  If she put no other signs up, this sign would appear to be in compliance with the Sign Code, which allows "one sign" meeting certain criteria, at least so long as she did not

display it for more than 60 days in a calendar year.  However, Smoot desires to display this sign imminently and keep this sign displayed all the way through May 2020.

50.     Any day that the RINO sign is displayed in her yard, it constitutes the "one sign" allowed pursuant to Code § 24-6(2), and Smoot is *forbidden* from displaying *any other signs whatsoever* that are not otherwise favored under the Sign Code (such as lot sale signs, or "student achievement" signs, as discussed below).

51.     If the Sign Code were not in place, in addition to her RINO sign, Smoot would display (i) a sign such as discussed above to encourage residents to consider running for Shavano Park office, and (ii) a sign such as discussed above regarding the Northwest Military Highway project.

52.     Further, Smoot desires to exercise her right and discretion to display one or more additional signs regarding other elections and issues, or conveying non-political messages (such as community events), as necessary, without having to remove the other signs to make room under the Sign Code for the additional message she wishes to convey. For example, Smoot intends to organize community meetings at which interested persons can organize together to try to influence TXDOT's plans for the Military Highway project.  She would, accordingly, like to display a sign stating: "This Friday—come find out how to save our oak trees from TXDOT!," with the place of meeting included after that statement.   A sign like this would be important to display for a week or so prior to any such meeting, and then would not be displayed otherwise. Another example would be a sign communicating a position regarding an issue that might be up for consideration before the San Antonio City Council, or the Bexar County Commissioners' Court.  Regardless of how many pressing issues are at play in any number of jurisdictions, all affecting Shavano Park residents, the Shavano Park Sign Code permits only "one sign" (other

than those favored signs that are specifically allowed by the city), outside of a "voting period." Smoot cares deeply about many such issues and desires to express her views with signs currently prohibited by the Sign Code.

53. Smoot additionally desires, before and during the "voting period" for purposes of Code § 24-6(5), to display a 4' x 8' campaign sign for a candidate (whether for herself or for another candidate), in addition to other, smaller campaign yard signs permitted during the "voting period."

54. However, the "voting period" restrictions at Code § 24-6(5) do not allow 4' x 8' signs, and limit total sign area to "no more than 36 square feet," which would essentially rule out even a *single* other standard 2' x 3' yard sign if the same yard displays a single 4' x 8' sign.

55. While Smoot desires to run for political office in the City, the Sign Code's unconstitutional provisions prohibit the effective communication of her messages.

### Relevant Law

**Shavano Park's Sign Regime**

56. The City has enacted a comprehensive sign regulation regime, found at Chapter 24 of the Code of Ordinances.

57. Structurally, Chapter 24 declares all signs—at least those on *private* property—to be unlawful, and punishable as public nuisances, unless a particular type of sign is otherwise allowed under Chapter 24:

> **Except as otherwise provided for in this chapter, it shall be unlawful to erect, display, maintain, or cause to be erected, displayed or maintained, on private property located in the City**, any advertising bench, animated or moving sign, awning, canopy or marquee sign, back-to-back sign, bandit sign, billboard, bill poster, electric sign, embellishment, flashing sign, monument sign, on-premise sign, prohibited neon, blinking, rotating, animated, moving, flashing or intermittently illuminated sign, pole sign, portable sign, pylon sign, any sign protruding above the building roof line or parapet line, painted or Day-

Glo colored sign, banner sign, valance or display constructed of cloth, canvas, light fabric, paper, pliable vinyl, plastic or other light material, wall sign, any sign placed in exchange for a monetary or bartered benefit, any sign, displaying any matter in which the dominant theme of the material taken as a whole appeals to the prurient interest in sex, or is patently offensive because it affronts contemporary community standards relating the description or representation of sexual matters, and is utterly without redeeming social value. **Such action is hereby declared to be a public nuisance. Any sign not specifically listed as being allowed in this chapter is expressly prohibited**.

Code § 24-3.

58.     Section 24-6 governs "Non-nuisance signs in residential zoning districts."  This section provides, in full:

In A-1, A-2, A-3, A-4, A-5 PUD, MXD and CE zoning districts the following signs are hereby not deemed to be a public nuisance:

(1)     Upon final plat approval, a single sign may be erected temporarily on each approved plat or development, provided, however, that such sign shall not exceed 60 square feet in sign area, including its framing, trim and molding, and shall be placed so as not to interfere with the occupancy or use of any lots in the subdivision. All such signs shall be removed upon completion of the sale of 95 percent of the lots in the subdivision.

(2)     Each residential property may erect one sign on the property that conforms to the following requirements:

a.     The sign cannot be displayed in such a manner that it can be visibly viewed from the public right-of-way for more than 60 days per calendar year;

b.     The gross sign area shall not exceed six square feet in sign area including framing, trim and molding;

c.     The sign shall not be higher than six feet above grade;

d.     The sign shall not be placed on public property including a public easement or right-of-way; and

e.     The sign cannot be an illuminated or backlit.

(3)     In encouragement of the practice of recognizing achievements and student activities, each residential property may erect two signs that conform to the following requirements:

a.     The signs cannot exceed four square feet in sign area, including framing, trim and molding;

b.     Signs shall be placed within ten feet of the front facing of the primary residence;

    c.    Signs shall not be higher than four feet above grade;

    d.    The sign cannot be an illuminated or backlit.

(4)    During the period the residential property is listed for sale or lease, a sign may be erected on the property, subject to the restrictions noted in section 24-6(2)(b)—(e). Residential lots fronting on two streets shall be allowed one sign facing each street.

(5)    Signs during voting periods. Each residential property may erect signs in addition to those described in section 24-6(2) and section 24-6(3) during voting periods, as defined in section 24-2, subject to the following restrictions:

    a.    No sign may be erected more than 60 days prior to the start of the voting period;

    b.    All signs must be removed by 11:59 p.m. the day following the voting period;

    c.    The total sign area of all voting period signs must be no more than 36 square feet, and no one sign shall be larger than 24 square feet;

    d.    No voting period sign may be higher than six feet above grade; and

    e.    The signs cannot be illuminated or backlit.

Signs erected in violation of these regulations are considered a nuisance and may be removed by the City Manager or his/her designee.

Code § 24-6.

59.    Section 24-6 thus draws distinctions between different types of signs based on their content, and subjects them to different regulations.

60.    First, it provides certain specifications that seem to be related to commercial advertisement of subdivision plots:  "Upon final plat approval, a single sign may be erected temporarily on each approved plat or development," which may be "60 square feet in sign area," and must "be removed upon completion of the sale of 95 percent of the lots in the subdivision." Code § 24-6(1).

61.    Then, subsections (2) through (5) regulate different types of signs on residential property.

62.   Each residential property may erect one sign, visible no more than 60 days per year, that is limited to six square feet in sign area, and no higher than six feet above grade.  Code § 24-6(2).

63.   But "[i]n encouragement of the practice of recognizing achievements and student activities, each residential property may erect two signs" limited to four square feet in sign area, no higher than four feet above grade.  Code § 24-6(3).  These signs must be within ten feet of the front of the residence.  Id.

64.   The Code separately treats "[s]igns during voting periods," stating that "each residential property may erect signs in addition to" the "one sign" allowed for 60 days and the two student achievement signs.    Code § 24-6(5).  Such "voting period" signs cannot exceed 36 square feet in "total sign area of all voting period signs," and no single voting period sign may be larger than 24 square feet.  *Id.*  They cannot be higher than six feet above grade, and may only be displayed from 60 days "prior to the start of the voting period" though 11:59 p.m. of "the day following the voting period."  *Id.*  Importantly, "voting period corresponds only with elections administered by Bexar County."  *Id.* § 24-2.

65.   But signs advertising a residence for sale or lease receive treatment more favorable than the "one sign," or the two student achievement signs, or the voting period signs, in material ways.  *Id.* § 24-6(4).

66.   A residential sale or lease sign may be six square feet in area, and no higher than six feet above grade, like the "one sign" allowed under § 24-6(2), but not limited to 60 days per calendar year.  Id.  Instead, a residential sale or lease sign is permissible "[d]uring the period the residential property is listed for sale or lease," *id.*, that is, with no hard temporal restriction.

Moreover, "[r]esidential lots fronting on two streets shall be allowed one sign facing each street."

*Id.*

67.     "Banner signs" are another category defined by Shavano Park and are subject to still different regulations:

> Banner signs in residential zoning districts are allowed subject to the following requirements:
>
> (1)    Banner signs may be erected by property owners' associations as defined by the Texas Residential Property Owners Protection Act.
>
> (2)    Each property owner's association may erect one banner sign at each entrance.
>
> (3)    Each residential property owner may erect one banner sign.
>
> (4)    No banner sign may be erected more than seven days prior to the first Tuesday in October.
>
> (5)    Banner signs must be removed by 11:59 p.m. the day following the first Tuesday in October.
>
> (6)    Banner signs on public property shall be governed by a separate City policy.

Code § 24-7.

68.     Thus, while each residential property owner "may erect one banner sign," this is only permitted in the last "seven days prior to the first Tuesday in October." *Id.* §§ 24-7(3), (4). While this severe temporal restriction is untethered to any particular event on its face, the intent and effect of this provision is to permit "banner signs" related to National Night Out. According to the website of the National Night Out organization:

> National Night Out is an annual community-building campaign that promotes police-community partnerships and neighborhood camaraderie to make our neighborhoods safer, more caring places to live. **National Night Out enhances the relationship between neighbors and law enforcement while bringing back a true sense of community. Furthermore, it provides a great opportunity to bring police and neighbors together under positive circumstances**.
>
> Millions of neighbors take part in National Night Out across thousands of communities from all fifty states, U.S. territories and military bases worldwide on

> the first Tuesday in August (Texas celebrates on the first Tuesday in October).
> Neighborhoods host block parties, festivals, parades, cookouts and various other
> community events with safety demonstrations, seminars, youth events, visits from
> emergency personnel, exhibits and much, much more.

National Night Out, https://natw.org/about (last visited Aug. 2, 2018) (emphasis added).

69.     Shavano Park's banner sign provision therefore permits banner signs timed to coincide with National Night Out, and presumably messages about other events or issues if displayed during the same timeframe, but renders any banner signs displayed during any other time of the year to be unlawful public nuisances.

70.     While these strict regulations, subjecting different signs to different regulations depending on their content, apply to signs on private property, "[s]igns located on public property shall be governed by a separate City policy."   Code § 24-2 (definition of "public property").   *See also* § 24-11(b) ("The City Council reserves the right to establish policies governing signage on City property.").

**Penalty Provisions**

71.     "Signs posted or placed in violation hereof are hereby declared to be public nuisances and such violations shall be reported promptly to the Chief of Police or City Code Compliance Officer."  Code § 24-15.

72.     "The City Code Compliance Officer (or such other individual or classification of individuals as may be appointed by the City Council) may issue a citation requiring the removal, relocation, or reconstruction of any sign which does not meet the spacing, height, size and setback requirements of this chapter and other City ordinances for which the erection or construction was began on or after the effective date of the ordinance from which this chapter is derived."  Code § 24-12.

73.     A nuisance violation is punishable by a fine of up to $2,000, with each day of continuation of the nuisance constituting a separate offense.  Code § 1-10 (general penalty).

74.     "Each act of violation and each day upon which any such violation shall continue or occur shall constitute a separate offense."  Adopting Ordinance, Ord. No. 300-01-09, § 4 (2009). "In addition to the penalty prescribed above, the City may pursue other remedies such as abatement of nuisances, injunctive relief and revocation of licenses or permits."  *Id.*; *see also* Code § 20-26 (also providing for cumulative relief, including injunctive relief, against violations).

### **First Amendment Principles**

75.     The government always bears the burden of justifying speech-restrictive laws. *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 425 (5th Cir. 2014).

### **Permanent Injunctive Relief**

76.     Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

77.     The Shavano Park sign code has deprived, and will continue to deprive, Plaintiff of her fundamental rights protected by the First and Fourteenth Amendments.  Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable.  Accordingly, appropriate injunctive relief and a declaration of the unconstitutionality of the statutes are necessary.

78.     Plaintiff faces a credible threat of prosecution if they post any "sign" in violation of the strict requirements of the sign code.

79.     Plaintiff is not willing to expose herself, or her supporters who might display signs at her request, to criminal and civil penalties, and thus they have been forced to refrain

from engaging in core expressive activity pending vindication of her constitutional rights.  Not only was Plaintiff already injured by the removal and confiscation of her signs, preventing their further display, but Plaintiff was and is still unable to create and display different or new signs without incurring further potential penalties imposed by the City.

80.     Plaintiff intends to engage in the activity indicated herein, and unless the unconstitutionality and/or other illegality of the challenged restrictions is recognized, Plaintiff's rights, under the First Amendment to the United States Constitution and article 1, Section 8 of the Texas Constitution, will be restricted by preventing her from carrying out her desired expressive activities in these specific intended instances and in other similar intended circumstances.

81.     The free speech and associational rights of others not before the Court will be similarly infringed as the challenged provisions are applied to other Shavano Park residents and enforced by these Defendants.  *See Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974); *Catholic Leadership*, 764 F.3d at 423-24.

## COUNT 1

### Shavano Park lacks authority under Texas law to impose a sign code

82.     Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

83.     The City of Shavano Park is a general law municipality under Texas law, which is a type of municipality distinct from a home rule municipality.

84.     "Unlike home-rule municipalities, general-law municipalities…are political subdivisions created by the State and, as such, possess only those powers and privileges that the

State expressly confers upon them." *Town of Lakewood Village v. Bizios*, 493 S.W.3d 527, 531 (Tex. 2016).

85.     The Texas Local Government Code addresses authority for sign codes and restrictions. *See* Tex. Loc. Gov't Code §§ 216.001-.903. There is no general authority conferred there, or anywhere else, for general-law municipalities to impose a sign code.

86.     In fact, the Code expressly confers such authority only on home-rule cities. *Id.* 216.901 ("A home-rule municipality may license, regulate, control, or prohibit the erection of signs or billboards by charter or ordinance."). The Texas Supreme Court has repeatedly held that "[l]aws expressly applicable to one category of municipalities are not applicable to others." *Bizios*, 493 S.W.3d at 531 (internal quotation and punctuation omitted).

87.     Nor can a general-law municipality's power to impose a sign code be implied from any other authority. The Supreme Court "strictly construe[s] general-law municipal authority and any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the municipality, and the power is denied." *Id.* at 536.

88.     As a result, the entirety of Shavano Park's sign code, both as it existed before the October 2016 ordinance and in light of that ordinance, is invalid.

89.     The Sign Code violates the rights of speech and association of Plaintiff and of any and all persons who desire to or would display similar signs, at a Plaintiff's request or on their own.

90.     The Sign Code also violates the First Amendment rights of members of the public, as it prevents them from viewing the messages that would otherwise be displayed.

91.     The Sign Code has deprived, and will continue to deprive, Plaintiff and others similarly situated of their fundamental rights protected by the First and Fourteenth Amendments

of the United States Constitution and the Texas Constitution.  Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable.  There is no adequate remedy at law.

### COUNT 2

**Even if Shavano Park had authority to impose a sign code, it is preempted to the extent it conflicts with Local Gov't Code § 216.903.**

92.     Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

93.     Because Shavano Park has no authority to regulate the erection of signs in the first place, Local Government Code § 216.903 does not apply to Shavano Park.  However, in the alternative, if the Court holds that Shavano Park has authority to impose a sign code, then said statute provides some protection for political signs.

94.     Local Government Code § 216.903 provides some protection for "a sign that contains primarily a political message and that is located on private real property with the consent of the property owner."  Specifically, this provision states that the municipality may not "prohibit the sign from being placed," "require a permit or approval of the municipality or impose a fee for the sign to be placed," or provide for a charge for removal of the sign that is greater than the charge for removal of other signs regulated by ordinance.  Tex. Loc. Gov't Code § 216.903.  The provision also states that the municipality must allow a sign up to 36 feet in area, and up to eight feet high.

95.     Shavano Park's Sign Code conflicts with this statute in several ways.

96.     The Sign Code is preempted to the extent that it imposes any temporal parameters on any sign with "primarily a political message."  Thus, the temporal parameters in Code §§ 24-

6(5) ("voting period" signs) and 24-6(2) (the "one sign" allowance for up to 60 days a year) are preempted to the extent they would apply to a sign with "primarily a political message."

97.    The Sign Code is also preempted to the extent it imposes harsher size restrictions than Section 216.903, including in imposing an overall size limitation for all signs together, as Section 216.903 imposes an area restriction only on the size of any *single* sign.

98.    The Sign Code violates the rights of speech and association of Plaintiff and of any and all persons who desire to or would display similar signs, at a Plaintiff's request or on their own.

99.    The Sign Code also violates the speech and associational rights of members of the public, as it prevents them from viewing the messages that would otherwise be displayed.

100.    The Sign Code has deprived, and will continue to deprive, Plaintiff and others similarly situated of their fundamental rights protected by the First and Fourteenth Amendments of the United States Constitution and the Texas Constitution.  Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable.  There is no adequate remedy at law.

## COUNT 3

**The banner sign limitation is facially unconstitutional because it is not appropriately tailored to further any proffered government interest and because it is impermissibly vague.**

101.    Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

102.    The banner sign limitation, Code § 24-7, singles out a particular type of sign ("banner signs") and strictly prohibits any such signs, except for a narrow window the week before National Night Out.

103.    Plaintiff desired to, and would have, displayed a banner sign in her own yard, and requested willing neighbors to display banner signs in their yards, if the sign code did not strictly prohibit doing so.  Because she could not do so without violating the sign code (which permits no banner signs in a resident's own yard except preceding National Night Out in October), her rights have already been violated.

104.    Plaintiff further desires to display a banner sign in her yard in future years, and to ask willing neighbors to display banner signs in their yards in future years.

105.    Plaintiff further desires to display a banner sign in her own yard expressing other messages of her choice, as political, policy, or other occasions may arise, not limited to the narrow window before National Night Out.

106.    The banner sign limitation is a content-based speech restriction for two reasons. First, it is content-based on its face in that it is limited to a narrow temporal window during the calendar year that coincides with National Night Out.  Even in the absence of further evidence, this coincidence reflects a preference for supporting banner signs regarding one particular event. It is thus content-based on its face and subject to strict scrutiny.

107.    Second, the evidence will reflect that the City Council did in fact allow this one narrow exception for banner signs because of its desire to support National Night Out, even though it banned similar signs at any other time of the year.  The limitation is thus content-based on account of the City Council's subjective motivation.

108.    As a content-based speech restriction, the banner sign limitation is subject to strict scrutiny.  The City must therefore justify the narrow temporal window in which banner signs are permitted by demonstrating that the temporal window is narrowly tailored to furthering a compelling City interest.  The City cannot do so.

109.    However, Plaintiff will prevail even under intermediate scrutiny.  The City cannot defend its banner sign limitation because, whatever aesthetic rationale it claims supports a limit on banner signs, such rationale is not even rationally related to this provision, which makes an exception for a particular temporal window during the year.

110.    With respect to banner signs at "each entrance," the banner sign limitation is further content-based in that it censors speech of all but "property owners associations as defined by the Texas Residential Property Owners Protection Act."  Code § 24-7(1).  Code §§ 24-7(1) and (2) are not mere police regulations protecting property owners' use of their property or furthering the government's interest in enforcing trespass laws.  The provisions are not general provisions directed at any trespass, but rather are targeted to regulate only "banner signs," which are speech.   "Sign means an outdoor structure, sign, display, light device, figure, painting, drawing, message, plaque, poster, billboard, *or other thing that is designed, intended, or used to advertise or inform*."  Code § 24-2 (emphasis added).  Placing one's property on the property of another is potentially punishable by trespass regulations, and if not, the City's code could be revised to ensure that it is.  But here, the City has singled out only property that expresses a message, and then limited the ability to express a message at "each entrance" (entrance *to what* is not exactly clear) *to certain types of associations*.  The City cannot defend these distinctions under any level of scrutiny, as they are unrelated to any legitimate government interest.  For example, if the City proposes that § 24-7 is supposed to be read to permit the property owners association for a particular neighborhood, and nobody else, to display banner signs at "each entrance" to that neighborhood (which is not at all clear), then the provision would allow such banners in neighborhoods *represented by a property owners' association* but prohibit banners at "each entrance" of neighborhoods *not* represented by a property owners' association.   This

distinction is unrelated to any aesthetic objective of the City; rather, its effect is to permit or prohibit banner signs at "each entrance" based on the identity of the person or entity wishing to display it, which is government censorship based on the identity of a speaker.

111.    The banner sign limitation is further unconstitutional because the exception granted to the City itself renders the provision underinclusive.  *See* Code § 24-7(6) ("Banner signs on public property shall be governed by a separate City policy.").  This underinclusiveness undermines any argument that the limitation is necessary to further a legitimate government objective, but instead indicates that it was passed simply out of a desire to limit speech of others while leaving the City free to display its own banner signs as it pleases.  In addition to underinclusiveness, this represents yet another instance of discrimination based on the identity of the speaker that the City cannot defend.

112.    The banner sign limitation is further invalid because it is impermissibly vague. There is no definition of "banner sign," leaving this provision impossible to understand as to its scope and inviting uneven and censorial application by city officials.

113.    The banner limitation violates the rights of speech and association of Plaintiff and of any and all persons who desire to or would display similar signs, at Plaintiff's request or on their own.

114.    The banner limitation also violates the speech and association rights of members of the public, as it prevents them from viewing the messages that would otherwise be displayed on banner signs at times of the year other than immediately preceding National Night Out.

115.    The banner limitation has deprived, and will continue to deprive, Plaintiff and others similarly situated of their fundamental rights protected by the First and Fourteenth

Amendments.  Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable.  There is no adequate remedy at law.

## COUNT 4

**The general ban on all signs not otherwise approved, with an allowance for "one sign" that may be displayed no more than "60 days per calendar year," is facially unconstitutional because it is not appropriately tailored to any legitimate government interest.**

116.    Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

117.    The distinctions between this "one sign" limitation and the limitations on residential sale or lease signs are content-based and afford more favorable treatment in material ways to sale or lease signs than the "one sign" that may express political, ideological, or other messages.  A residence may post two sale or lease signs, if the residence fronts on two streets, whereas the same residence may not do so with signs expressing other messages.  Moreover, sale or lease signs are not subject to a strict 60-day limit.

118.    The "one sign" category is also treated differently than signs "recognizing student achievements and student activities," for which two signs are allowed with no temporal limitations.

119.    These distinctions are content-based, yet the City cannot defend such line-drawing under any level of scrutiny, as these distinctions are unrelated to any legitimate government interest.

120.    The "one sign" limitation has deprived, and will continue to deprive, Plaintiff and others similarly situated of fundamental rights protected by the First and Fourteenth Amendments and the Texas Constitution.  Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable.  There is no adequate remedy at law.

## COUNT 5

**Shavano Park's wholesale exclusion of signs on city property from its general sign code is facially unconstitutional because Shavano Park cannot justify such discrimination against residential property owners in favor of the city's own speech**.

121.    Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

122.    The Sign Code imposes strict and detailed restrictions as to all signs on non-city property, but leaves for a later day, if at all, the regulation of signs posted by the City (or by others) on the City's own property.  While the City surely has more leeway in restricting the uses of municipal property as compared to private property, the City cannot justify its detailed regulation of signs on private property in the furtherance of any legitimate government interest where it does not subject signs on its own property to restrictions aimed at the same goals.

123.    The Sign Code has deprived, and will continue to deprive, Plaintiff and others similarly situated of fundamental rights protected by the First and Fourteenth Amendments and the Texas Constitution.   Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable.   There is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.    A declaratory judgment that the entire Sign Code is illegal and unenforceable, facially and as-applied, because Shavano Park has no authority to impose a sign code under State law;

2.    A declaratory judgment that the Sign Code is illegal and unenforceable,  facially and as-applied, to the extent that it is preempted by Local Government Code § 216.903 with regard to signs with "primarily a political message";

3.      A declaratory judgment that Code sections 24-3, 24-6(2), (3), (4), and (5), and 24-7, are facially unconstitutional under the First Amendment to the United States Constitution;

4.      A declaratory judgment that Code sections 24-3, 24-6(2), (3), (4), and (5), and 24-7, are unconstitutional under the First Amendment to the United States Constitution as applied to Plaintiff;

3.      A permanent injunction enjoining Defendant from enforcing the Sign Code, or, in the alternative, Code sections 24-3, 24-6(2), (3), (4), and (5), and 24-7, against Plaintiff or against any other person;

4.      An award of nominal damages for the violation of Plaintiff's constitutional rights, both for the past violations and the continuing injury of chilled speech;

5.      An award of compensatory damages;

6.      An order that the City return any confiscated signs;

7.      Reasonable and necessary attorneys' fees, expenses, and costs pursuant to 42 U.S.C. § 1988 or any other applicable statute or authority; and

8.      Any other relief that the Court deems just and appropriate.

Respectfully submitted,


_____/s/ Jerad Najvar_____
Jerad Wayne Najvar
Texas Bar No. 24068079
jerad@najvarlaw.com
Austin M.B. Whatley (application for admission to
W.D. Tex. forthcoming)
Texas Bar No. 24104681
austin@najvarlaw.com
NAJVAR LAW FIRM, PLLC
2180 North Loop West, Suite 255
Houston, TX 77018
281.404.4696 phone
281.582.4138 fax

*Counsel for Plaintiff*